**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BEATE E. WALKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cv-01496** |
| | ) | **Judge Aleta A. Trauger** |
| **TRANE U.S., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Plaintiff Beate Walker filed her Verified Complaint (Doc. No. 1) in December 2015, asserting a claim of discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Now before the court is the defendant's Motion for Summary Judgment. (Doc. No. 13.) The motion has been fully briefed and is ripe for review. For the reasons set forth herein, the court will grant the motion and dismiss this case with prejudice.

I.     **MATERIAL FACTS**[1]

Defendant Trane U.S., Inc. ("Trane") is engaged in the manufacture of industrial heating, cooling, and ventilation systems. It operates a manufacturing plant in Clarksville, Tennessee, employing approximately 1200 people. Walker was employed by Trane as a production leader from 1998 until her discharge on February 5, 2014. A production leader supervises 25 to 50 hourly production-line employees and is responsible for safety, quality, delivery, employee morale, and employee engagement.

In 2012, Trane conducted a series of "roundtable" meetings in which hourly employees

---

[1] These facts are drawn from Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 20-1) and are undisputed for purposes of the Motion for Summary Judgment, unless otherwise indicated.

provided the human resources department with feedback about their work environments. During the roundtable meetings, employees complained about several of their production leaders. According to Erin O'Connor-Dziedzic ("O'Connor"), who was at that time Trane's human resources manager, the purpose of these meetings was "to determine what was causing the morale issues amongst hourly employees" in the particular production area where Walker was assigned to work. (O'Connor Decl. ¶ 3, Doc. No. 17.)

O'Connor attended these meetings; line-management did not. (*Id.* ¶ 3.) O'Connor avers that the complaints about Walker, of all the production leaders, "were, by far, the most pronounced." (*Id.* ¶ 4.) "Specifically," she said, "I heard time and again that Ms. Walker frequently employed a bullying, belittling, and generally abusive communication style when interacting with her hourly subordinates." (*Id.*)[2]

After the roundtable meetings, O'Connor met with plant management to discuss options for addressing the morale issues. At one of these meetings, Trane management discussed discharging Walker. (O'Connor Decl. ¶¶ 5–6; York Dep. 76, Doc. No. 16-8.) Instead of discharging her at that time, however, the company agreed that production manager Jason York would provide Walker with a "fresh start" by permitting her to transfer to the area of the plant that he managed—the "Voyager 3" production line. Up until that time, Walker had worked in the "Voyager 2" production area under production manager Kevin Frilling.

---

[2] Walker attempts to refute O'Connor's assertion that the complaints about Walker were more pronounced than those concerning other supervisors by pointing out that Trane has not produced any documentation of the results of the roundtable meetings. (Pl.'s Resp. to Def.'s Statement of Undisp. Facts ¶ 9, Doc. No. 20-1.) O'Connor, however, was present in the meetings and is competent to testify about what she witnessed. In addition, Walker has not established that any documentation of those meetings was actually created.

Walker also points to the deposition testimony of her supervisor in 2013, where he was asked about the 2013 Employee Engagement Consensus Survey. (York Dep. 86–88, Doc. No. 20-4, at 28–30.) That survey, which did yield written results, is completely separate from the 2012 roundtable meetings.

Around June 27, 2012, Frilling and O'Connor together drafted a memorandum to Walker (the "June 2012 Memo"), ostensibly from Frilling, regarding her reassignment. (O'Connor Decl. ¶ 7; Doc. No. 16-3.) This Memo states:

> As you know, the Company has been conducting a series of roundtable meetings with employees on the Voyager 2 production line to gain a better understanding of issues driving high turnover.
>
> Feedback from the employee population identifies your behavior in the workplace as significantly contributing to a poor work environment. You have been coached in the past about needing to control your temper and behave in a professional manner.
>
> You are being moved to a new department in the hopes that this new environment will enable you to address any leadership deficiencies and learn to respond to employee issues and production issues in an acceptable, supportive and productive manner. *Beate, it is imperative that you understand that further unacceptable or inappropriate behavior on your part will result in termination of your employment.*
>
> The Company offers a variety of resources that you may find helpful as you work to make required improvements. I encourage you to reach out to the Employee Assistance Program for personal support, and I also encourage you to identify courses, either through our Learning Management System, or through community or professional agencies for training. Our leadership team is prepared to assist and support your [sic] with this training; however, you must understand that responsibility to correct these issues is yours.
>
> I am hopeful that you can make and sustain the required improvements to allow you to become a successful member of the Trane team. Please let me know what assistance you require.
>
> Effective July 1, 2012, you will be reporting to Jason York. Jason is aware of the reasons for this decision and is also available to provide guidance, training and support.

(Doc. No. 16-3 (emphasis added).) A handwritten notation indicates that O'Connor met with Walker on July 10, 2012 to discuss the June 2012 Memo, which Walker refused to sign. O'Connor also wrote across the bottom of the Memo: "Complaints from employees – numerous employees – about disrespectful behavior. Discussed incident with Rose Worthington recently when Beate cursed at her. She is losing trust from mgmt & employees." (*Id.*) Walker testified

that she received the memorandum, which she characterized as a "writeup": "According to the company, I was written up for – they had a roundtable meeting. There was a meeting with the hourly employees. And they say I was verbally abusing [hourly employees]." (Walker Dep. 29–30, Doc. No. 16-2.)

Walker does not accuse Frilling of discriminating against her on the basis of gender. Rather, despite the clarity of the June 2012 Memo, Walker insists that Frilling never counseled her on how she treated other employees or indicated that there was a problem with her management, and he "was as surprised as [she] was that [she] was given a Reassignment of Work Location." (Walker Aff. ¶ 3, Doc. No. 20-3.) Although she does not deny receiving the June 2012 Memo or speaking with O'Connor about it, she claims she was "never given details about what she was doing wrong or who [she] was supposed to be abusing." (*Id.* ¶ 5.) She complains that she was never allowed to refute the allegations against her or show O'Connor the evidence that she had less employee turnover than the other production leaders on her line. (*Id.* ¶¶ 8–9.)

In July 2012, Walker began working in the Voyager 3 production area, where she was supervised by Jason York. According to O'Connor, "[w]ithin several months of Ms. Walker's transfer to Voyager 3, hourly employees began coming to [O'Connor's] office and complaining about Ms. Walker's abusive management style." (O'Connor Decl. ¶ 9.)

In March 2013, York completed the 2012 Year End Performance and Leadership Competency Review for Walker. (Doc. No. 16-6.) He noted that "the company cannot ignore Beate's problems early in the year. Specifically, verbal abuse to hourly employees." (Doc. No. 16-6, at 5.) That comment pertained to the behavior that prompted Walker's move to the Voyager 3 production area and that predated York's supervision of Walker. York's evaluation of

Walker's performance during the six months of 2012 when Walker was actually under York's supervision was essentially positive, except in the areas of "Builds Talent and Capability" and "Coaches for Performance," where she was rated as having "Low Proficiency" and "No to Very Low Proficiency." (Doc. No. 16-6, at 6.)

In September 2013, Trane conducted a company-wide employee engagement survey. (Doc. No. 6-7.) Walker denies receiving a copy of the survey; she maintains instead that she was shown only her "percentage rating" in the survey and not the responses of the hourly employees who reported to her. (Pl.'s Decl. ¶ 10, Doc. No. 20-3.) According to O'Connor, "[t]he employee engagement scores for areas Ms. Walker supervised were disproportionately negative." (O'Connor Decl. ¶ 10.) Walker objects that the defendant has not provided documentation of other production leaders' results. (Pl.'s Resp. to Def.'s Statement of Undisp. Facts ¶ 20, Doc. No. 20-1.)[3]

Shortly after the results of the engagement survey were released, Jason York conducted a survey of the Voyager 3 hourly employees called "Start, Stop, Continue." The employees filled

_____

[3] Walker also contends that her results were not as unfavorable as Trane maintains. She states:

> York testified that Walker's score for the standard "I am proud I work for the company" was 55% whereas his own was only 49%. York testified that this was because York's own scores were based upon a combination of all production leaders' score[s]. For York's scores to be lower than Plaintiff's scores, the other production leaders' scores had to be even lower tha[n] Plaintiff's.

(Pl.'s Resp. to Def.'s Statement of Undisp. Facts ¶ 20, Doc. No. 20-1 (citing York Dep. 86–88, Doc. No. 20-4); *see also* Doc. No. 16-7, at 16.) There are other areas as well in which the plaintiff's "Favorable" rating percentage is higher than York's. However, the plaintiff's ratings are substantially lower in such areas as "Employees are getting the training they need to keep up with customer demands," "My immediate manager gives me feedback that helps me improve my performance," "My immediate manager provides me with recognition or praise for good work," and "The coaching I receive from my immediate manager is helpful in improving my performance." (Doc. No. 16-7, at 18, 26–27.) Regardless, because neither party has adequately explained this 40-page document or how to interpret it, the court accords it little weight.

out forms for each supervisor that simply asked them to list activities their supervisor should "start" doing, "stop" doing," and "continue" doing. The form also provided space at the bottom for "Additional Comments." (*See* Doc. No. 16-9.) According to York and O'Connor, the employees' feedback about Walker was substantially worse than it was for the other supervisors in the Voyager 3 production area. (*See* York Dep. 106, Doc. No. 16-8 ("Ms. Walker's 'start, stop and continue' negative comments compared to the other supervisors and production leaders, it was astronomically more negative with negative comments."); O'Connor Decl. ¶ 12 ("I reviewed the 'Start, Stop, Continue' feedback relating to each of the leaders in Voyager-3. Ms. Walker's feedback was by far the most negative.").)

Forty "Stop, Start, Continue" forms filled out by Walker's supervisees are in the record. (Doc. No. 16-9.) Of these, approximately half provide negative or very negative comments. For example, many of the comments suggest that Walker "start" being fair and respecting people and "stop" playing favorites and "downing" people. (*See, e.g.*, Doc. No. 16-9, at 1, 3, 4, 5, 7, 8, 10, 11, 13, 14, 15, 18, 22, 27.) Approximately a quarter of the surveys are neutral or provide both positive and negative comments[4]; another quarter are very positive.[5]

York and O'Connor met in January 2014 to discuss the results of the Start, Stop, Continue survey. (York Dep. 45, 93, Doc. No. 16-8; O'Connor Decl. ¶ 13.) In the same meeting, they discussed Walker's low employee engagement scores on the employee engagement survey and the fact that O'Connor was continuing to hear complaints directly from hourly employees about Walker's "abusive management style." (O'Connor Decl. ¶ 13.)

---

[4] For instance, some employees complain about favoritism but nonetheless commend Walker for being supportive or a "great supervisor." (*See, e.g.*, Doc. No. 16-9, at 33, 36.)

[5] Positive comments include, "I have no problems with how Beate runs the line. I love having her as my forman [sic]," "I think she's doing a great job!!" and "Doing a great job overall." (Doc. No. 16-9, at 17, 19, 31.)

The evidence regarding who exactly made the decision to terminate Walker is somewhat conflicting. O'Connor testified that she and York together determined that Walker had not improved her management style since receiving the June 2012 Memo and that it would be necessary to terminate her employment. (O'Connor Decl. ¶ 14.) York testified that the decision was "a collaboration between human resources [i.e., O'Connor], [him]self, and the plant manager. And it was a unanimous consensus." (York Dep. 45, Doc. No. 16-8.) He clarified that he and O'Connor presented the matter to the plant manager. (*Id.*) The defendant's answer to the plaintiff's Interrogatory No. 14, however, states that Kevin Frilling and Jason York made the decision to terminate Walker. (Doc. No. 20-19, at 10.)

In any event, on February 5, 2014, O'Connor and York met with Walker and informed her that her employment was being terminated. Walker was told at the time she was terminated that it was "due to" the June 2012 Memo.

The defendant presents evidence of other Trane supervisory employees who were disciplined or terminated around the same time for similar reasons. For example, Juarez Jarman, a male production leader, was discharged in February 2014, a few days after Walker, due to complaints about his management style. Buck Tidwell, a male production leader, was placed on a Performance Improvement Plan ("PIP") in October 2014 (York Dep. Ex. 7, Doc. No. 20-9) for abusive behavior toward the employees he supervised. He was discharged sometime thereafter due to "performance issues." (York Dep. 44, Doc. No. 16-8.)[6] In addition, Dwight Byard, a male

---

[6] The plaintiff alleges that Tidwell's termination was characterized by the company as a reduction in force. In support of this assertion, she points only to a handwritten post-it note, of unidentified origin, that was purportedly included in the defendant's Response to Plaintiff's Request for Production of Documents (Doc. No. 20-20, at 33), stating "Josh Miller stated Tidwell's termination was a reduction in force." The record does not indicate who wrote this note. York testified that, regardless of how it was characterized, Tidwell was terminated for cause.

production leader, was demoted as a result of his low scores on the employee management survey. Valerie Woodby, a female production leader supervised by Kevin Frilling at the same time as Walker, received negative comments about her management style during the 2012 employee roundtable meetings. Like Walker, Woodby was given a "writeup" and moved to a new area. Thereafter, human resources did not receive any more complaints about Woodby's management style. Woodby has since been promoted and remains employed by Trane.

## III.    LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim, the moving defendant must show that, as a matter of undisputed material fact, the plaintiff cannot establish at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of

fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## IV.  ANALYSIS

Walker asserts one claim of sex discrimination in violation of Title VII, based on the termination of her employment in 2014.

A plaintiff may prove unlawful discrimination by proffering either direct or indirect evidence. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016). In this case, the plaintiff proffers indirect evidence. To analyze Title VII claims using indirect evidence, the Sixth Circuit applies the burden-shifting approach established by the *McDonnell Douglas* line of cases. *Id. See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under this approach, Walker must first establish the elements of a prima facie case. To do so, she must show that she was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated employees outside the protected class. *Tennial*, 840 F.3d at 302 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). If Walker can establish these elements, then the burden shifts to Trane to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. Assuming that Trane can clear that minimal hurdle, Walker can still survive the company's motion for summary judgment if she can "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Tennial*, 840 F.3d at 302 (citation omitted).

### A.  Prima Facie Case

Walker has established the elements of her prima facie case. First, as a woman, she is a

member of a protected class for purposes of her sex discrimination claim. *Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004). Second, her discharge is a classic example of an adverse employment action. *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007). Third, she was objectively qualified for the position she held, and the defendant does not contend otherwise. Indeed, in light of the fact that Walker had held the position for more than fifteen years, Trane would have difficulty arguing that she was unqualified. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–66 (6th Cir. 2000) (noting that determination of the "qualified" prong of the prima facie case will generally "involve assessing whether the plaintiff was meeting the employer's expectations *prior to* the onset of the events that the employer cites as its reason for the termination"). And finally, Trane concedes that Walker was replaced by a male employee. (York Dep. 108, Doc. No. 16-8.)

### B.     Legitimate, Non-Discriminatory Reason for Adverse Employment Action

Because the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009).

Trane has offered a legitimate, non-discriminatory reason for the discharge: it states that Walker was discharged due to repeated complaints about Walker's abusive management style. Poor communication, management and leadership skills constitute legitimate, non-discriminatory reasons for an employee's termination. *See, e.g.*, *Brown v. Ohio State Univ.*, 616 F. Supp. 2d 740, 751 (S.D. Ohio 2009) ("Reasons such as lack of leadership and management skills, the failure to accept problems within her responsibility, untimely completion of assignments, and

poor communication are legitimate non-discriminatory reasons for an employee's demotion or termination." (collecting cases)).

### C.     Pretext

Because the employer has offered a nondiscriminatory reason for the adverse action, the burden shifts back to Walker to prove that the stated reason is pretextual. At this stage, the plaintiff has the burden to produce "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). In the Sixth Circuit, a plaintiff can show pretext in "three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate discharge." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citations omitted). The test should not be applied formalistically or rigidly. Rather, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen*, 580 F.3d at 400 n.4.

### 1.     *Whether the Proffered Reasons Have a Basis in Fact*

The proffered reason has a clear basis in fact. There is no dispute that the plaintiff received the June 2012 Memo after the human resources manager was made aware of numerous employees' complaints about Walker. The Memo unequivocally notified her that her unprofessional behavior and failure to control her temper placed her job in jeopardy and that she was being moved to a different department "in hopes that this new environment will enable you to address any leadership deficiencies and learn to respond to employee issues and production issues in an acceptable, supportive and productive manner." (Doc. No. 16-3.) The human resources manager, O'Connor,  testified that she continued to receive complaints about Walker's leadership style after the move, and the "Stop, Start, Continue" survey demonstrated a problem

with the plaintiff's leadership style.

Although the plaintiff disputes whether her evaluations were that much worse than those of other supervisors and contends that her conduct was not actually abusive, the information in Trane's possession at the time it made the decision to terminate the plaintiff's employment clearly was sufficient to give Trane reason to believe that a substantial number of Walker's subordinates were unhappy with her leadership style.[7] The fact that the plaintiff performed well in some areas and even that she was liked by some of her employees, as documented by her annual performance evaluations and the "Start, Stop, Continue" surveys, does not refute the evidence that she was not performing well in her interactions with a substantial percentage of her subordinates. So long as Trane had an honest belief that Walker was abusive to her employees, supported by reasonable reliance on particularized facts, she cannot establish that the company's proffered reason was pretextual, even if it is ultimately shown to be incorrect. *See Russell v. Univ. of Toledo*, 537 F.3d 596, 605 (6th Cir. 2008) ("Under this circuit's 'modified honest-belief doctrine,' for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (some internal quotation marks omitted)).

In sum, the plaintiff has not presented sufficient evidence from which a jury could conclude that Trane's proffered reason for firing her was false.

### 2. *Whether the Proffered Reason Did Not Actually Motivate Discharge*

In an attempt to show that the proffered reason did not actually motivate the discharge, the plaintiff argues that (1) similarly situated male employees were treated more favorably than

---

[7] The fact that some of her subordinates liked her a lot actually tends to substantiate the comments from others that she had "pets" and "favorites." (*See, e.g.*, Doc. No. 16-9, at 3, 4, 10.)

she was; and (2) the company did not follow its own policies prescribing progressive discipline.

*a. Similarly Situated Male Employees*

Walker points to Trane's treatment of Dwight Byard, Ricky Brock, and Buck Tidwell, arguing that they were treated more favorably than she.[8] According to Walker:

(1) Byard, a production leader, testified that he was offered the option to accept a demotion to the position of quality tech in October 2014, as a result of low employee survey scores. (Byard Dep. 5–6, Doc. No. 20-12, at 2–3.)

(2) Brock, a production leader, received a written warning as a result of a harassment complaint in December 2006. (Doc. No. 20-14.) Brock was required to attend training sessions on "interpersonal skills" and "leadership skills" and allowed to keep his job. (*Id.*; Doc. No. 20-15.)

(3) Tidwell was a production leader supervised by Jason York. He was placed on a PIP in October 2014. (Doc. No. 20-9.) The PIP specifically identifies unacceptable behavior on the part of Tidwell throughout 2014, including arguing with employees, being physically threatening, and employing favoritism. The PIP identified very specific corrective actions Tidwell would be required to take, including that he should take two classes ("Leadership Essentials: Leading with

---

[8] The plaintiff also points to an employee named Phelon Spencer as a comparator. Spencer was a production leader from 2008 through 2015. In 2011, he was given a PIP by Jason York, who supervised him at that time, for having a bad attitude and not attending "boards." (Spencer Dep. 7–9, Doc. No. 20-18.) Spencer submitted a written rebuttal to human resources, contesting the factual bases for his PIP, after which he and the company came to a mutual agreement to remove the PIP from his file. According to the plaintiff, Spencer now has a "clean slate" and remains employed by Trane. (Doc. No. 20, at 17.)

Trane objects to the introduction of evidence about Spencer, pointing out that the plaintiff has introduced additional facts in her Response in Opposition to the Motion for Summary Judgment that were not included in a separate statement of facts as to which the plaintiff contends there is a material factual dispute. The court concludes that the facts introduced by the plaintiff regarding Spencer do not establish that he was similarly situated in all material respects. In particular, it does not appear that Spencer was charged with abusive behavior or treating his supervisees disrespectfully.

Emotional Intelligence" and "Leadership Essentials: Motivating Employees") and participate in "Respect Effect training" within thirty days. (*Id.*) The PIP notified him that "failure to address the described performance behaviors may result in further disciplinary action up to and including termination." (*Id.*)

Walker argues that these male production leaders, like the plaintiff, were accused of engaging in verbally abusive, harassing, or otherwise inappropriate behavior but, unlike Walker, they were not discharged. Byard was given the opportunity to take a demotion. Brock was found guilty of intimidating and harassing behavior only after a full investigation in which he was allowed to participate, and he was put on a PIP. Tidwell was placed on a PIP. Walker argues that she was never given the opportunity to refute the allegations against her; she was not placed on a PIP that specifically notified her what conduct was considered inappropriate; and she was never given specific instructions on how to correct her behavior. She asserts that the only other female production leader, Valerie Woodby, was similarly left to her own devices rather than being given a PIP and specific directives as to how to remedy her conduct. Walker argues that, if she had been given the same opportunities as the male employees, "there is no doubt that" she would have corrected her behavior. (Doc. No. 20, at 20.)

In response, the defendant points out that the plaintiff, contrary to her assertion, was given notice of her unacceptable behavior and an opportunity to cure it, in the form of the June 2012 Memo. Byard, in contrast, received no written notice but simply a pay cut and demotion to a different position. Brock, Tidwell, and Woodby, like Walker, were all production leaders about whom the defendant received complaints of verbal abuse or harassment. All received some form of written notice: Brock received a written warning; Tidwell received a PIP; Walker and Woodby each received a "reassignment of work location" that also specifically placed them on

notice of inappropriate behavior. According to the defendant, after receiving the writing, Woodby and Brock reformed their behavior and remain employed by Trane. Woodby has even been promoted. Tidwell, however, was ultimately terminated due to "performance issues" and employee complaints about his management style. (York Dep. 39–44, Doc. No. 16-8.) Another production leader, Juarez Jarman, was also given written notice but failed to improve his conduct; he was fired the same week as Walker, due to complaints about his management style. (O'Connor Decl. ¶ 17; Trane EEO Response, Doc. No. 20-20, at 1–2.) Trane argues, in short, that it "treated production leaders guilty of abuse or harassment similarly in all material respects: Trane warned them in writing (albeit using different forms), offered them training and, if they did not improve their conduct, terminated them, regardless of gender." (Doc. No. 21, at 5.)

The court finds that, overall, the treatment of these various employees, although somewhat different from Walker's treatment, was not markedly more favorable. And certainly not so favorable as to give rise to a permissible inference that the proffered reason for the plaintiff's discharge was not the real reason. Rather, the treatment of these other production leaders confirms that Trane took complaints against its supervisors seriously and that it was not unusual for the company to discipline or terminate production leaders for inappropriate conduct or poor leadership skills.

*b. The Company's Policies Prescribing Progressive Discipline*

Walker argues that Trane has in place a Performance Counseling Policy (Doc. No. 20-5) that, she argues, requires managers to follow a specific course of progressive discipline. She argues that Buck Tidwell received a PIP in compliance with the Performance Counseling Policy but that Jason York never gave her a PIP. Tidwell's PIP, which was signed by human resources manager Josh Miller and by York, outlines specific corrective action that Tidwell was expected

to take, including completing two leadership classes and participating in "Respect Effect training." (York Dep. Ex. 7, Doc. No. 20-9.) Regarding the plaintiff, however, York testified that it was not his "responsibility to teach someone how to be respectful to another person." (York Dep. 47, Doc. No. 20-4.) Walker suggests that this discrepancy calls York's credibility into question. She also points out that no other department used the anonymous "Start, Stop, Continue" survey that York used, and no other employees were fired as a result of this survey.

In response, Trane asserts that the Performance Counseling Policy does not actually require a PIP. Rather, it states that "appropriate disciplinary action may have to be taken, up to and including termination, without prior warning or notice." (Doc. No. 20-5.) Trane also argues that the differences between her treatment and that of other employees highlighted by the plaintiff amount to "minor differences" that "reflect permissible differences in how different human resources managers approached discipline." (Doc. No. 21, at 4.) That is, three different human resources managers were involved in the disciplinary actions at issue here. HR Manager Privott Stroman issued Brock's "Written Warning" in 2006. (Doc. No. 20-14.) HR Manager Erin O'Connor worked with Kevin Frilling to provide Walker and Woodby with their "Reassignment of Work Location" in 2012. (Doc. No. 17 ¶¶ 7–8.) HR Manager Josh Miller, who replaced O'Connor in February 2014, working with York, issued the PIP to Tidwell in October 2014. (Doc. No. 20-9; O'Connor Decl. ¶ 1.) Moreover, although the plaintiff complains that she should have been placed on a PIP prior to being terminated, Trane points out that only one of the male production leaders disciplined or terminated around the same time as the plaintiff for abusing or harassing employees received a PIP. In addition, while it is true that Tidwell's PIP directed him to take training classes, Stroman instructed Brock to take certain training classes in his written warning; and O'Connor admonished Walker to take training classes in her written counseling.

The court finds that Trane's failure to comply strictly with its own Performance Counseling Policy in its treatment of Walker is not suggestive of discrimination in this case, particularly because it is apparent that Trane regularly failed to comply with its own policy. While it is certainly advisable for a company to follow its written policies, failure to do so does not *per se* amount to evidence of discrimination. As set forth above, all of the employees disciplined for abusive leadership practices were treated basically consistently, with minor discrepancies that appear to be related to the identity of the production manager and human resources manager involved and when the action occurred. The minor factual discrepancies on which the plaintiff relies simply do not give rise to a reasonable inference that Trane's proffered reasons did not actually motivate the decision to terminate Walker.

### 3.     *Whether the Proffered Reasons Were Insufficient to Motivate Discharge*

Poor management and leadership skills constitute legitimate, non-discriminatory reasons for an employee's termination. *Brown v. Ohio State Univ.*, 616 F. Supp. 2d at 751. Moreover, as set forth above, the record in this case makes it clear that Trane took seriously complaints about its production leaders' attitudes and treatment of their subordinate employees. The fact that another employee, Juarez Jarman, was terminated for his abusive leadership tactics within days of the plaintiff's termination further establishes that the proffered reasons were sufficient to motivate discharge.

Walker attempts to argue that her conduct was less egregious than that of Jarman and Tidwell. Even assuming that the plaintiff's conduct was less egregious, the record makes it clear that the complaints about her conduct were consistent and repeated. The plaintiff has not presented "sufficient evidence from which a jury could reasonably reject [Trane's] explanation of why it fired her." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

## V. CONCLUSION

For the reasons set forth herein, the court finds that the plaintiff has not established the existence of a material factual dispute to call into question the legitimacy of the defendant's proffered reasons for terminating her employment. Because the plaintiff cannot establish that the defendant's reasons are pretext for unlawful discrimination, the court will grant the defendant's Motion for Summary Judgment.

An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge